Christopher Sproul (State Bar No. 126398)
Jodene Isaacs (State Bar No. 226895)
Page Perry (State Bar No. 246266)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376, (510) 847-3467
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com
Email:  jisaacs@enviroadvocates.com

Fredric Evenson (State Bar No. 198059)
ECOLOGY LAW CENTER
Monterey Bay
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: evenson@ecologylaw.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION,<br><br>Plaintiff,<br>v.<br><br>GRANITE CONSTRUCTION COMPANY and GRANITE CONSTRUCTION INCORPORATED,<br><br>Defendants. | Civil Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>DEMAND FOR JURY TRIAL<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et. seq.) |

Ecological Rights Foundation ("EcoRights"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. section 1251 *et seq*. (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. section 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On April 20, 2015, EcoRights provided notice of violations of the CWA at the Felton Quarry Facility ("the Facility") by Defendants Granite Construction Company and Granite Construction Incorporated (collectively "Granite") and of EcoRights' intention to file suit against Granite to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Region 3 ("Regional Board"); the U.S. Attorney General, and the Defendants ("Notice Letter") as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). A copy of this Notice Letter is attached to this complaint as Exhibit 1.

3.      More than sixty days have passed since notice was sent to Granite and the state and federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to CWA section 505(c)(1), 33 U.S.C. §1365(c)(1), because the source of the violations is located within this judicial district as are Plaintiffs and their counsel.

## II.    INTRADISTRICT ASSIGNMENT

5.      Intradistrict assignment of this matter to either the San Francisco Division or the San Jose Division of the Court is appropriate pursuant to Civil Local Rule 3-2(c). The events and

1  the property at issue which give rise to EcoRights' claims occurred in Felton, Santa Cruz County,

2  California. However, Plaintiff's principal place of business is to the north of the City of San

3  Francisco, and Plaintiff's lead counsel resides in San Francisco. Defendant maintains an office in

4  Santa Clara. Thus, it would likely be most convenient for the parties if this case were assigned to

5  the San Francisco or San Jose Division of the Court.

6  **III.**     **INTRODUCTION**

7        6.        This complaint seeks relief for alleged unlawful discharges of pollutants from

8  Granite's Felton Quarry facility located at 1800 Felton Quarry Road, Felton, California into waters

9  of the United States in violation of the Clean Water Act and the State of California's General

10  Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-

11  DWQ, as amended by Order No. 97-03-DWQ ("Industrial Stormwater Permit").

12        7.        Violations of the Clean Water Act and the Industrial Stormwater Permit by small

13  industrial sites are recognized as a leading cause of significant, cumulative impacts to the water

14  quality of the San Lorenzo River and Monterey Bay. With every rainfall event, polluted rainwater

15  from industrial, commercial, and urbanized lands, including Granite's, pour into storm drains and

16  into area receiving waters. The consensus among agencies and water quality specialists is that

17  stormwater pollution accounts for more than half of the total pollution entering California's

18  receiving waters each year.

19        8.        Stormwater runs off of industrial sites such as the Facility, causing harm to

20  humans and aquatic life. In particular, stormwater from such industrial facilities contains

21  suspended sediment and chemicals that are potentially significant to the beneficial uses of the San

22  Lorenzo River and Monterey Bay at its confluence with the San Lorenzo River. Quarries in the

23  San Lorenzo River watershed have been identified as a potential source of sediment during major

24  storm events, reportedly caused by the failure of on-site settling/retention ponds to contain event

25  stormwater runoff. The sediments of the San Lorenzo River and its tributaries act as a sink for

26  bioaccumulative deposits of heavy metals, and strong winds and currents continually re-suspend

27  and redeposit these metals. These contaminants ultimately make their way to Monterey Bay. Toxic

28  chemicals can thus be concentrated in the food web of the River and Bay as toxic metals and other

Complaint                                      Page 2

contaminants absorbed by fish and birds farther up the food chain. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological and reproductive effects. Fish are widely used to evaluate the health of aquatic systems because pollutants accumulate in fish, which are an important part of aquatic food chains. Heavy metals have been shown to alter physiological activity in tissues and blood of fish.

9.      High concentrations of total suspended solids ("TSS") degrades optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and PAHs, are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

10.     Granite's stormwater discharges from the Facility contribute to the ongoing stormwater pollution problem and exemplify the epidemic of violations of industrial stormwater permits that EcoRights is seeking to eliminate or reduce. These pollution discharges can and must be curtailed for the San Lorenzo River to be restored to ecological health.

## IV.    <u>PARTIES</u>

11.     EcoRights is a non-profit public benefit corporation organized under the laws of California, with its main office in Garberville, California. EcoRights' purpose is to educate the public about environmental practices which cause harm to human health, the environment and other natural resources, and to seek redress from those harms through litigation or alternative dispute resolution. EcoRights represents citizens in protecting California's waterways from pollution, securing the multitude of benefits that flow from clean, vibrant waters: safe drinking water, abundant and diverse wildlife populations, healthy recreational opportunities, and economic prosperity from commercial fishing, tourism, and other commercial activities that depend on clean water. To further its goals, EcoRights actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

12.     Members of EcoRights, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate around the San Lorenzo River watershed and Monterey Bay at its confluence with the San Lorenzo River (hereinafter collectively referred to as "impacted waters"), into which Granite Construction causes pollutants to be discharged. These EcoRights members use and enjoy the impacted waters for recreational, educational, scientific, conservation, aesthetic, and spiritual purposes. Granite Construction's alleged discharge of stormwater containing pollutants impairs each of those uses. Thus, the interests of EcoRights' members have been, are being, and will continue to be adversely affected by Granite's failure to comply with the Clean Water Act and the Industrial Stormwater Permit.

13.     The Felton Quarry Facility is operated by Defendant Granite Construction Company, a wholly-owned subsidiary of Granite Construction Incorporated. Felton Quarry staff who are located at the facility at 1800 Felton Quarry Road, Felton, California and at the Granite Construction Company Coastal Region office in Santa Clara, California submit most reporting required under the Industrial Stormwater Permit.

14.     Through its various corporate and subsidiary entities, Granite operates the Felton Quarry Facility where it conducts bulk aggregate mining, storage, offloading, and sales activities.

## V.     REGULATORY BACKGROUND

### Clean Water Act

15.     CWA section 301(a), 33 U.S.C. §1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

16.     CWA section 402(p) requires that NPDES permits be issued for stormwater discharges associated with industrial activities.

17.     CWA section 402(b) allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and its

nine Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

18.     CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

19.     CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $32,500 for all violations occurring on or after March 15, 2004 through January 12, 2009, and $37,500 per day per violation for violations occurring after January 12, 2009. CWA § 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4.

**State Regulations**

20.     The San Lorenzo River is heavily degraded from pollutant loading. This is officially recognized by the EPA, the State Board and the Regional Board, which have placed the San Lorenzo River on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards. The Regional Board's Basin Plan is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region. Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses. The Basin Plan sets forth narrative water quality objectives for sediment, settable matter, and suspended materials, as well as narrative objectives for not impairing water quality with oil sheens, turbidity, or other nuisance conditions. The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objective for certain pollutants of concern such as copper, lead, and zinc.

21.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR") sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries. The CTR, which applies to inland rivers, such as the San Lorenzo and its tributaries Limestone Brook and Gold Gulch Creek, and includes limits for several toxic metals.

**The General Industrial Stormwater Permit**

22.     In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity. The Industrial Stormwater Permit is an NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p). To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual NPDES permit.

23.     The Industrial Stormwater Permit contains certain absolute prohibitions. Discharge Prohibition A(1) of the Industrial Stormwater Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Discharge Prohibition ¶ A.2 of the Industrial Stormwater Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation ¶ C.1 of the Industrial Stormwater Permit prohibits discharges that adversely impact human health or the environment. Receiving Water Limitation ¶ C.2 of the Industrial Stormwater Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

24.     In addition to absolute prohibitions, the Industrial Stormwater Permit contains a variety of substantive and procedural provisions with which dischargers must comply. At a minimum, dischargers must employ measures to reduce or eliminate stormwater pollution that constitute the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Pollutant Control Technology ("BCT"). Industrial Stormwater Permit, Effluent Limitation B(3).

25.     Dischargers must develop and implement a Stormwater Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. *Id.* at ¶ A(1) and Provision § E.2. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and authorized non-stormwater discharges from the facility. *Id.* at ¶ A.2. The

SWPPP must identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. *Id*. The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.*, Effluent Limitation ¶ B.3.

26.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.* at ¶¶ A.1-A.10.

27.     The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times. Industrial Stormwater Permit, § C. The SWPPP and site maps must be assessed annually and revised as necessary to insure accuracy and effectiveness. *Id.* at ¶¶ A.1, B.3, and 4.

28.     Facility operators are required to develop and implement a monitoring and reporting program ("MRP") when industrial activities begin at a facility. *Id.* at ¶ B.1 and Provision ¶ E.3. The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial Stormwater Permit. *Id.* at ¶ B.2. The MRP must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and

1   revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

2        29.     Pursuant to the monitoring and reporting requirements of the Industrial

3   Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and

4   non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-

5   stormwater and to reduce or prevent pollutants in stormwater and authorized non-stormwater

6   discharges. *Id.* at ¶¶ B.3, 4. Facility operators must collect samples of stormwater discharges from

7   *all* locations where stormwater may be discharged from the facility. *Id.* at ¶¶ B.5, 7. Facility

8   operators must submit Annual Reports to the Regional Board accurately reporting their monitoring

9   activity. *Id.* § B: MRP Requirements, ¶ 14 & § C: Standard Provisions, ¶¶ 9 and 10.

10  **VI.**     **STATEMENT OF FACTS**

11       30.     In most of the Monterey Bay area, stormwater drains untreated either directly, or

12  through the storm drain system, into the Bay and its tributaries. Among those who specialize in the

13  field of water quality locally, it is well known and commonly understood that stormwater pollution

14  accounts for the majority of pollution entering California's receiving waters each year. With every

15  rainfall event, hundreds of millions of gallons of polluted rainwater, originating from area

16  industries, pour into the Bay and its tributaries.

17       31.     Granite operates the Felton Quarry Facility which is located off of Felton Quarry

18  Road, east of Highway 9 in Santa Cruz County, California.

19       32.     Activities at the Facility include the quarrying and mining of rock and stone,

20  including maintaining large piles of various types of crushed stone throughout the site. Discharges

21  of stormwater flow off the Facility at four different discharge points and flows into Limestone

22  Brook and/or Gold Gulch Creek and ultimately into the San Lorenzo River and Monterey Bay.

23       33.     The operations at the Facility occur outdoors and are causing pollutants to be

24  exposed to rainfall. At the Felton Quarry Facility, the industrial materials are stored outdoors in large

25  piles open to wind and storm water flows. Bulk aggregate facilities such as Felton Quarry generate

26  large amounts of dust and particulate matter which settle on the ground and other surfaces which are

27  exposed to storm water and non-storm water flows. The Facility lacks sufficient and/or sufficiently

28  well-maintained berms or other structural controls to retain stormwater on the Facility. Granite does

not sufficiently treat contaminated stormwater prior to discharge from the Facility. The large number of trucks entering and leaving the Facility track dirt, metals, and other pollutants off-site and onto Felton Road where rainfall washes these pollutants into the storm drain system or directly into waters of the United States.

34.    The types of pollutants that the Facility releases into the immediate environment include, among others: aluminum, iron, and zinc; and total suspended solids ("TSS") and pH-affecting substances. The industrial materials stored, and the pollutants generated, at the Facilities are exposed to stormwater flows.

35.    All of the Facility is unpaved. Thus, pollutants from the Facility's activities can soak into unpaved ground and later become mobilized in stormwater flows.

**Granite Activities Contributing to CWA Violations**

36.    On information and belief, Granite has not developed and/or implemented an adequate SWPPP at the Facility.

37.    On information and belief, Granite has not implemented BMPs that adequately minimizes the exposure of pollutants at the Facility to stormwater.

38.    On information and belief, Granite has not implemented BMPs at the Facility that adequately control and minimize contaminated runoff from the facility.

39.    On information and belief, Granite has not implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

40.    On information and belief, Granite has not adequately evaluated and revised its SWPPP for the Facility to address these failures. Granite has also failed to fully implement its SWPPP and properly operate and maintain the structures and systems that have been put in place to achieve compliance with the Industrial Stormwater Permit and SWPPP requirements.

41.    On information and belief, Granite has not developed and/or implemented an adequate MRP at the Facility.

42.    On information and belief, Granite's monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging into stormwater flows from the Facility.

43.     On information and belief, Granite has failed to complete all of the visual observations and stormwater sampling required by the Industrial Stormwater Permit at the Facility.

44.     On information and belief, Granite's monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revision of each its SWPPP.

45.     Due to Granite's lack of effective pollution prevention measures, its failure to implement effective best management practices, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents. Dust, sand, toxic metals such as aluminum, iron and zinc; and TSS and pH-affecting substances become entrained in stormwater when such water flows over and across the outdoor processing areas of the Facilities. This polluted stormwater is discharged to the tributaries of the San Lorenzo River, which then flows into Monterey Bay.

46.     Granite's own stormwater sampling indicates that discharges of stormwater from the Facility is consistently contaminated with higher levels of pollutants than is permissible under the Industrial Stormwater Permit.

## VII.     CLAIMS

### FIRST CLAIM FOR RELIEF

**Discharges of in Violation of Technology-Based Effluent Limitations
(Violations of 33 U.S.C. § 1311)**

47.     Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

48.     The CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities). The Facility discharges stormwater associated with industrial activity to tributaries of the San Lorenzo River and Monterey Bay which is contaminated with pollutants. The Facility discharges stormwater pursuant to the Industrial Stormwater Permit, which authorizes these discharges conditioned on the Facility complying with the terms of the Industrial Stormwater Permit. Each of these permit terms

1   constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. §

2   1365(f). The Facility's stormwater discharges have violated numerous of these permit terms,

3   thereby violating CWA effluent limitations.

4          49.     The Effluent Limitations of the Industrial Stormwater Permit, ¶ B.3, prohibit the

5   Facility from discharging pollutants above the level commensurate with the application of BAT

6   and BCT. On every day the Facility has existed since at least August 4, 1995, Granite has been

7   discharging polluted stormwater from the Facility containing levels of pollutants above the level

8   commensurate with the application of BAT and BCT in violation of the Effluent Limitations, ¶

9   B.3, of the Industrial Stormwater Permit during every significant rain event (defined by the United

10  States Environmental Protection Agency as a rainfall event generating 0.1 inches or more of rain).

11  Significant local rain events are reflected in the rain gauge data available at

12  http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html. Attached as Attachment 2 to

13  Exhibit 1 is a table reflecting the rainfall data for the past five years, as reported to the Felton

14  Station, the closest monitoring station available on the NOAA website.

15         50.     EPA and the State Board have published Benchmark Values set at the maximum

16  level of pollutant loading generally expected if an industrial facility is employing BAT and BCT

17  (which are set forth in Attachment 1 to Exhibit1). As reflected in Attachment 1 to Exhibit 1, the

18  Facility has repeatedly discharged stormwater from each of the discharge locations identified in

19  Defendants' Annual Reports containing pollutant levels exceeding Benchmark Values, which

20  establishes that the Facility has discharged pollutants above a level commensurate with application

21  of BAT and BCT. Attachment 1 compiles some of the self-monitoring data reported by the Facility

22  to the Regional Board reflecting the Facility's sampling of actual stormwater discharges, as well as

23  samples taken by others from the Facility. The sample results reflected in Attachment 1 are

24  representative of the pollutant levels in the Facility's discharge of stormwater, including such

25  discharges that Granite did not sample or analyze. Thus, every instance when the Facility has

26  discharged stormwater, including instances when the Facility has discharged stormwater that it has

27  not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels

28  set forth in Attachment 1. Such polluted stormwater discharges from the Facility have occurred

Complaint                                    Page 11

1   during every significant rain event that the Facility has existed since at least August 4, 1995.

2   51.      EcoRights representatives further observed discharges of stormwater from the

3   Facility on December 3, 2014. EcoRights representatives observed very turbid water and high

4   flows downstream of the site in Gold Gulch Creek. BAT and BCT levels of treatment at the

5   Facility would necessarily be sufficient to prevent the discharge of excessively turbid wastewater.

6   Thus, the presence of such turbidity in the stormwater discharges further establishes that Granite

7   has discharged and is continuing to discharge stormwater that is not treated to a level

8   commensurate with application of BAT and BCT. EcoRights alleges that the stormwater

9   discharges EcoRights observed on this day is representative of the stormwater discharges generally

10  and thus every day Granite has discharged stormwater (*i.e.*, during every significant rain event

11  since at least August 4, 1995 that the Facility has been in existence), Granite has discharged

12  stormwater with levels of pollutants exceeding that which would be present if Granite employed

13  BAT and BCT treatment.

14  52.      EcoRights further alleges that on each day that Granite has discharged

15  stormwater, Granite has discharged stormwater that was not treated to a level commensurate with

16  BAT or BCT in violation of the Effluent Limitations of the Industrial Stormwater Permit, ¶ B.3.,

17  because, as further alleged in the Third Claim, below, Granite has not developed and implemented

18  a SWPPP that mandates BMPs that are commensurate with BAT and BCT for the Facility.

19  53.      Unlawful discharges of stormwater from the Facility with levels of pollutants

20  exceeding BAT and BCT levels of control continue to occur presently and will occur in the future

21  during all significant rain events.

22  54.      Each discharge of stormwater from the Facility after the effective date of the

23  Industrial Stormwater Permit has constituted and will constitute a separate violation of the

24  Industrial Stormwater Permit's Effluent Limitations and the CWA. Every day since at least five

25  years and sixty days before the date Plaintiff filed this Complaint that Granite has discharged or

26  will discharge polluted stormwater from the Facility in violation of the Effluent Limitations of the

27  Industrial Stormwater Permit, ¶ B.3 is a separate and distinct violation of CWA section 301(a), 33

28  U.S.C. § 1311(a) which subjects Granite to an assessment of civil penalties pursuant to CWA

sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## SECOND CLAIM FOR RELIEF

### Discharges of in Violation of Water Quality-Based Effluent Limitations
### (Violations of 33 U.S.C. § 1311)

55.     Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

56.     The Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, prohibit stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. The Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, prohibit stormwater discharges to surface or groundwater that adversely impact human health or the environment. The Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.2, prohibit stormwater discharges that cause or contribute to an exceedance of applicable Water Quality Standards. Applicable Water Quality Standards are set forth in the Basin Plan[1] and the California Toxics Rule[2] ("CTR").

57.     The Basin Plan, *inter alia*, establishes the following Water Quality Standards for the San Lorenzo River:

(a) Controllable water quality shall conform to the water quality objectives contained therein. Basin Plan at III-2.

(b) Dissolved oxygen levels shall be a minimum of 5.0 mg/L [5,000 ug/L]. *Id*. at III-4.

(c) Suspended sediment shall not be discharged at rates that cause nuisance or adversely affect beneficial uses. *Id*. at III-3.

(d) Waters shall not contain settleable material in concentrations that result in deposition of material that causes nuisance or adversely affects beneficial uses.

---

[1] The Basin Plan is published by EPA on the internet at:
http://www.epa.gov/waterscience/standards/wqslibrary/ca/ca_9_san_francisco.pdf
The Basin Plan is also published by the Regional Board on the internet at:
http://www.swrcb.ca.gov/rwqcb2/basinplan.htm

[2] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31682

*Id.*

    (e)  Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. *Id.*

    (f)  Waters shall not contain oils, greases, waxes, or other similar materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses. *Id.*

58.    The Basin Plan further establishes numeric water quality criteria for zinc.

59.    Granite's discharges of stormwater from the Facility from each of the four discharge locations ("outfalls") identified in the Facility's Annual Reports have caused or contributed to an exceedance of one or more of the above-listed Water Quality Standards. Attachment 1 to Exhibit 1 compiles some of the self-monitoring data reported by the Facility to the Regional Board reflecting Granite's sampling of stormwater discharges. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that Granite did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that Granite has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1. Attachment 1 indicates that the Facility routinely discharges stormwater to the San Lorenzo River containing, *inter alia*, the following pollutants: aluminum, iron, zinc, specific conductance (EC), and total suspended solids (TSS). The levels of these pollutants in the Facility's stormwater discharges have caused pollution, contamination, or nuisance in violation of the Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2 and have adversely impacted the environment in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.1. Moreover, the discharge of these pollutants has caused the San Lorenzo River not to attain or contributed to these waters not attaining one or more applicable Water Quality Standards in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.1.

60.    Specifically, the Facility's discharge of excessive TSS has caused or contributed

to the San Lorenzo River not meeting applicable Water Quality Standards in the Basin Plan for levels of suspended sediment and turbidity. The Facility's discharge of stormwater containing suspended and settleable toxic metals and other materials has contributed to the deposition and/or dispersal of materials that interfere with beneficial uses of the San Lorenzo River and a detrimental increase in concentrations of toxic substances found in bottom sediments or aquatic life due to bioaccumulation.

61.     EcoRights alleges and puts Granite on notice that each day that Granite discharged stormwater from the Facility, the Facility's stormwater contained levels of pollutants matching the levels set forth in Attachment 1 to Exhibit 1 and thus caused levels of pollutants to exceed one or more of the applicable Water Quality Standards in the San Lorenzo River. Every day that the Facility has been in existence since the effective date of the above-referenced Water Quality Standards, which date back at least to 1986 in most instances, Granite has discharged stormwater from the Facility during at least every significant local rain event over 0.1 inches that has caused or contributed to Water Quality Standards not being met in the San Lorenzo River. Significant local rain events are reflected in the rain gauge data available at http://cdec.water.ca.gov and http://lwf.ncdc.noaa.gov/oa/ncdc.html, and, as mentioned above, summarized in Attachment 2.

62.     EcoRights representatives further observed discharges of stormwater immediately downstream from the Felton Quarry Facility on December 3, 2014. On this day, EcoRights representatives observed that the Facility's stormwater discharges were very murky and dark colored and thus visibly contained high levels of turbidity. Thus, the Facility's stormwater discharges cause the San Lorenzo River and its tributaries to fail to meet the Basin Plan's narrative water quality standards mandating that "Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." Basin Plan III-3. EcoRights alleges that the stormwater discharges EcoRights observed are representative of the Facility's stormwater discharges generally and thus every day Granite has discharged stormwater, Granite has discharged stormwater that causes the San Lorenzo River and its tributaries to fail to meet these Basin Plan water quality standards.

63.     The Stormwater discharges referred to in the preceding paragraphs further violate the Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, in that these discharges cause or threaten to cause pollution, contamination, or nuisance and further adversely impact human health and environment by polluting the San Lorenzo River with toxic metals and wastewater high in turbidity.

64.     Granite's unlawful discharges from the Facility continue to occur presently and will occur in the future during all significant rain events. Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2, and/or the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.2, and the CWA. Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Granite has discharged or will discharge polluted stormwater from the Facility in violation of Discharge Prohibitions of the Industrial Stormwater Permit, ¶ A.2 and/or the Receiving Water Limitations of the Industrial Stormwater Permit, ¶ C.2 is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Granite to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## THIRD CLAIM FOR RELIEF

### Failure to Develop and Implement an Adequate Stormwater Pollution Prevention Plan
### (Violations of 33 U.S.C. § 1311)

65.     Plaintiff incorporates the allegations contained in all preceding paragraphs as though fully set forth herein.

66.     On information and belief, Granite has failed to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by ¶¶ A.1, A.2, and A.9 of the Industrial Stormwater Permit.

67.     On information and belief, Granite has failed to prepare, maintain, revise and implement the Facility's SWPPP as required, as evidenced by stormwater discharges that exceed EPA and State benchmarks and contribute to violations of Water Quality Standards in receiving waters. The Facility's SWPPP does not specify adequate BMPs designed to reduce pollutant

discharge to BAT and BCT levels in accord with Section A: SWPPP Requirements, ¶ 8 of the Industrial Stormwater Permit as evidenced by the Facility's continued discharge of stormwater contaminated above pollutant levels attainable via application of BAT and BCT. For example, all of the following BMP measures (note, this is an illustrative, not exhaustive list) are technologically feasible, constitute BAT and BCT for the Facility, and would greatly decrease the Facility's discharges of contaminated stormwater: (1) Install dikes, curbs, and berms and increased on-site stormwater retention (in the form of storage ponds, swales and so forth) to divert or prevent stormwater from discharging; (2) Implement standard low impact development (LID) measures to "mimic [the] site's predevelopment hydrology by using design techniques that infiltrate, filter, store, evaporate, and detain runoff close to the source of rainfall." Help reduce the sediment and pollutant load of stormwater discharged by installing gabions, riprap, native rock retaining walls, straw bale barriers, sediment traps/catch basins, biotechnical stabilization, silt fences, siltation berms, brush sediment barriers, and vegetated swales and/or buffer strips for sediment control and collection; (3) Install permeable pavers in appropriate locations; (4) Install and properly operating maintain stormwater filtration systems with sufficient capacity to treat stormwater to a level necessary to prevent receiving waters from failing to meet applicable water quality standards; (5) Regular sweeping of the Facility with a regenerative sweeper to prevent the buildup of metals and other pollutants; (6) Constructing roof overhang structures or buildings and then conducting all motor vehicle fueling only under cover and away from exposure to rainwater; (7) Until such overhang structures or buildings are completed, to halt the practice of fueling motor vehicles during rainstorm events; (8) To place oil absorbent materials underneath stored vehicles and equipment that are sufficiently sized and sufficiently absorbent to prevent oil staining of the ground surrounding stored automobiles; (9) Store materials and indoor locations to the extent feasible and cover material stored outside with tarps.

68.     Granite's failures to draft an adequate SWPPP, and/or to revise, and/or to implement the Facility's SWPPP in all the above respects are in violation of the requirements of Section A of the Industrial Stormwater Permit. Granite was required to have prepared and implemented an adequate SWPPP by the start of operations (i.e. August 4, 1995) pursuant to the

previous Industrial Stormwater Permit issued by the State Board and by Section A: Stormwater Pollution Prevention Plan Requirements, ¶ 1 of the current Industrial Stormwater Permit. Therefore, Granite has been in daily and continuous violation of the Industrial Stormwater Permit's requirement to develop and implement an adequate SWPPP for the Facility on each and every day since August 4, 1995 that Granite has maintained the Facility. Granite will continue to be in violation every day that Granite fails to develop and implement an adequate SWPPP.

69.     Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Granite has failed to draft an adequate SWPPP, and/or to revise, and/or to implement the Facility's SWPPP in violation of the requirements of Section A of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Granite to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

### FOURTH CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate Monitoring and Reporting Program (Violations of 33 U.S.C. § 1311)**

70.     Plaintiffs incorporate the allegations contained in all preceding paragraphs as though fully set forth herein.

71.     On information and belief, Granite has failed to develop and implement an adequate monitoring and reporting program ("MRP") and implement all necessary revisions to the MRP at the Facility as required by Section B and Provision ¶ E.3 of the Industrial Stormwater Permit.

72.     Granite's MRP for the Facility must provide for collection of stormwater samples from the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. Section B: MRP Requirements, ¶ 5. Granite's MRP must further direct Granite to take and analyze samples from each discharge point at the Facility. *Id*. at ¶¶ 5, 7.a.

73.     Granite's Annual Reports submitted to the Regional Board for the Facility indicate that Granite has not consistently and/or properly taken and analyzed the required

samples. In 2011/12, Granite failed to provide results of analysis of samples from each discharge point at the Facility. For the first storm event sampled that year, Granite only sampled from 3 of 4 identified discharge locations. During the second storm event sampled, Granite only sampled from 2 of 4 identified discharge points. Granite's 2013/14 Annual Report provided sample results from only 2 of 4 discharge points during the first day of the February 9, 2014 storm event and only provided results of a sample taken on the following day from a third discharge point, in violation of the Permit requirements. During the second storm event sampled in 2013/14, Granite only sampled 2 of the 4 discharge points. Analysis of a samples from only some of the identified discharge points does not comply with the Permit requirements as it does not represent sampling from all representative discharge points that represent the "quality and quantity of the facility's stormwater discharges." *Id*. at ¶ 7.a.

74.     Granite's MRP for the Facility must provide for visual monitoring and recording of stormwater discharge from one rainfall event per month during the October 1 to May 30 wet season. Section B: MRP Requirements, ¶¶ 3, 4 and 7 (visual observation of stored or contained stormwater must be made during release). Granite's Annual Reports submitted to the Regional Board for the Facility indicate that in all years from at least 2011 to the present, Granite has not made and recorded at least one visual observation of all points of discharge of stormwater from the Facility during at least one rainfall event per month from October 1 to May 30. There were several months in this time period during which Granite had stormwater discharges from self-reported and unreported discharge points but failed to monitor stormwater discharges and record the results of this monitoring. Specifically, Granite failed to make the required visual observations of storms in the following months; 2012-April, 2013-September, October; 2014-April. Granite's Annual Reports simply skip some of these months altogether or otherwise fail to report visual observations of stormwater discharge on all days where NOAA climate data for the Felton station reports that there was rain over 0.1 inches. Thus there necessarily had to have been discharge from the Facility that Granite failed to observe and report. Accordingly, Granite has violated the visual monitoring requirements of Section B: MRP Requirements, ¶ 3 and the Annual Report requirements of Section B: MRP Requirements, ¶ 14 and Section C: Standard Provisions, ¶¶ 9

1  and 10.

2      75.     Granite's MRP for the Facility must provide for analysis of toxic chemicals and

3  other pollutants that are likely to be present in its stormwater discharges. Industrial Stormwater

4  Permit, Section B: MRP Requirements, ¶ 5. Sampling conducted by EcoRights has shown that the

5  Facility's stormwater discharges contain elevated specific conductance (EC), iron, and aluminum.

6  In addition, any party operating in the quarrying industry doing their due diligence would know

7  that stormwater from a Facility such as Felton Quarry would have high levels of these pollutants.

8  Granite's MRP for the Facility is inadequate because it fails to provide for analysis of these

9  pollutants

10     76.     Granite has failed to implement the Facility's MRP and/or an MRP that would be

11 compliant with the Stormwater Industrial Permit because Granite has not analyzed all of the

12 pollutant parameters listed in the preceding paragraph in each of the stormwater runoff events

13 from the Facility that Granite was required to take samples of. Specifically, Granite failed to

14 analyze the Facility's stormwater discharges from each of the 4 outfalls for zinc, iron, and

15 aluminum in the stormwater samples Granite has taken in every year since at least 2008.

16     77.     As alleged in the preceding paragraphs, Granite has not developed and

17 implemented an adequate MRP. Granite was required to have prepared and implemented an

18 adequate MRP by no later than August 4, 1995 pursuant to the previous Industrial Stormwater

19 Permit issued by the State Board and by Section B: Monitoring Program and Reporting

20 Requirements, ¶ 1.a. of the current Industrial Stormwater Permit. Therefore, Granite has been in

21 daily and continuous violation of the monitoring and reporting requirements of the Industrial

22 Stormwater Permit set forth in Section B: MRP Requirements every day since August 4, 1995.

23 Granite will continue to be in violation every day that Granite fails to develop and implement an

24 adequate MRP for the Facility.

25     78.     As further discussed above, Granite has not submitted accurate and complete

26 Annual Reports and reports of Granite's noncompliance with the Industrial Stormwater Permit.

27 Therefore, Granite has been in daily and continuous violation of the reporting requirements of the

28 Industrial Stormwater Permit, Section B: MRP Requirements, ¶ 14 and Section C: Standard

Provisions, ¶¶ 9 and 10 every day since each of Granite's Annual Reports were due.

79.     Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that Granite has failed to prepare and implement an adequate MRP as required by Section B: Monitoring Program and Reporting Requirements or comply with the reporting requirements of the Industrial Stormwater Permit, Section B: MRP Requirements, ¶ 14 and Section C: Standard Provisions, ¶¶ 9 and 10 is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects Granite to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

80.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged in Plaintiff's First through Fourth Claims above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Granite as set forth hereafter.

## VIII.      RELIEF REQUESTED

81.     Wherefore, EcoRights respectfully requests this Court to grant the following relief:

a.     Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the Industrial Stormwater Permit and the CWA;

b.     Enjoin Defendants from discharging pollutants from its Facility to the San Lorenzo River and Monterey Bay;

c.     Enjoin Defendants to restore all receiving waters damaged by Defendant's illegal discharges of pollutants from the Facility;

d.     Enjoin Defendants from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

e.     Order Defendants to pay civil penalties of up $37,500 per day in accord with CWA Section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1 - 19.4 (2009).

1    f.        Award Plaintiff its costs (including reasonable attorney, witness, and consultant

2    fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and

3    g.        Award such other relief as this Court may deem appropriate.

4  **IX.    DEMAND FOR JURY**

5        Pursuant to Federal Rule of Civil Procedure 38(b), EcoRights demands a jury trial in this

6    matter.

7  **X.      DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

8        Based on EcoRights' knowledge to date, pursuant to Civil Local Rule 3-16, the

9    undersigned certifies that, as of this date, other than the named parties, there is no such interest to

10   report.

11

12   Dated: June 23, 2015                              ENVIRONMENTAL ADVOCATES

13

14                                                     _Christopher a. Sproul_

15                                                     Christopher Sproul, Attorney for Plaintiff
                                                       ECOLOGICAL RIGHTS FOUNDATION

16

17

18

19

20

21

22

23

24

25

26

27

28